UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

COLONNA'S SHIPYARD, INC.,     :
               :
     **Plaintiff,**        :
               :
v.               :   **ACTION NO. 2:10CV63**
               :
THE CITY OF KEY WEST, FLORIDA,   :
               :
     **Defendant.**       :

## REPORT AND RECOMMENDATION

This case involves Colonna's Shipyard, Inc.'s ("Colonna's" or the "Company") claim for compensation due for work the Company performed in connection with an artificial reef project off the coast of the City of Key West, Florida ("Key West" or the "City"). The reef will eventually surround the 527-foot U.S.A.F. General Hoyt S. Vandenberg (the "Vessel"), which now sits on the sea floor some seven miles south of Key West. The Vandenberg's journey from surplus ship to underwater tourist attraction began with repairs and modifications performed by Colonna's at its yard in Norfolk, Virginia.[1]

Although Colonna's performed the work under a written contract with Reefmakers, LLC ("Reefmakers"), the Company now claims Key West is responsible for the unpaid balance due for its repairs. Its Complaint asserts four substantive theories of relief – breach of oral contract, quantum meruit, constructive fraud, and bailment damages – as well as imposition of a constructive trust. (ECF No. 1, pp. 5-8). After discovery, Key West moved for summary judgment on all four claims. Colonna's opposed Key West's filing and filed a cross motion for

---

[1] The project has spawned two lawsuits and two published opinions in this Court on the contours of maritime jurisdiction over the parties and the claims. Colonna's Shipyard, Inc. v. U.S.A.F. Gen. Hoyt S. Vandenberg, 584 F. Supp. 2d 862 (E.D. Va. 2008), Colonna's Shipyard, Inc. v. City of Key West, 735 F. Supp. 2d 414 (E.D. Va. 2010).

summary judgment arguing it was entitled to judgment on the <u>quantum meruit</u> count as a matter of law. Both motions were referred to the undersigned for a Report and Recommendation. The Court heard oral argument on April 12, 2011. For the reasons that follow, the undersigned recommends that the Court grant Key West's motion for summary judgment, deny Colonna's motion for summary, and dismiss Colonna's claims against the City.

## A.   RECOMMENDED FINDINGS OF UNDISPUTED MATERIAL FACT

Key West is a Florida municipality, with legislative powers vested in a seven-member Commission, consisting of six Commissioners and a mayor. (Key West Charter, Article 1, Section 1.01). William Verge served as District 1 Commissioner for Key West from 2006 to the end of October, 2009. (Verge Dep., ECF No. 29-4, pp. 6-9). Shawn Smith is Key West's City Attorney. (Smith Dep., ECF No. 42-2, p. 2).

Colonna's is a Virginia corporation engaged in ship repair from a facility in Norfolk, Virginia. (ECF No. 1, p. 1). Thomas Godfrey, Jr. is Colonna's president and CEO (Godfrey Dep., ECF No. 29-1, p. 5), Dave DiPersio is its CFO (<u>Id</u>., p. 27), and Richard Sobocinski is its Vice President of Contracts. (Sobocinski Dep., ECF No. 48-1, p. 8).

In June, 2001, Key West first approved a Memorandum of Understanding ("MOU") between the City and Artificial Reefs of the Keys ("ARK"). ARK was a Florida nonprofit, and the purpose of the MOU was to create an artificial reef using a decommissioned U.S. Naval vessel. (ECF No. 29-6, p. 30). The MOU required Key West to hold title to the vessel and "act as a conduit in the permitting process," (<u>Id</u>., p. 50), but required ARK to perform almost all of the tasks necessary to complete the project including arranging for all of the Vessel's modifications. The modifications were extensive and included "implementation of an approved environmental remediation plan at a properly accredited shipyard." (<u>Id</u>. p. 31). The City was

2

required to act as applicant for the project and "receive record title to the Vessel from the State of Florida." (Id., p. 32).

ARK eventually engaged Reefmakers to help ready the Vessel for sinking, and coordinate the project. (ECF No. 48-3, pp. 9-13). The City and ARK amended the MOU to reflect Reefmaker's role in the project, replacing another consultant, Resource Control Corp. (ECF No. 29-6, p. 38). Reefmakers later hired Colonna's to perform the necessary repairs and alterations to the Vessel in preparation for its trip to Florida and sinking. Key West was not involved in ARK's decision to retain Reefmakers, or in Reefmakers' decision to engage Colonna's. (Smith Dep., ECF No. 30-1, pp. 13, 17-18) (Sotocinski Dep., ECF No. 48-1, pp. 7-8).

Reefmakers and Colonna's entered into a written contract for the repairs which involved removing hazardous materials and readying the Vessel for a long tow to Florida. (Sobocinski Dep., ECF No. 48-1, pp. 2-3; Godfrey Dep., ECF No. 29-1, pp. 13-14). While Colonna's worked, Reefmakers made partial payments. Colonna's completed the work, but Reefmakers did not pay the entire balance due. (Godfrey Dep., ECF No. 29-1, p. 14). As a result, Colonna's filed suit against the Vessel in rem alleging a maritime lien. See Colonna's Shipyard, Inc. v. U.S.A.F. General Hoyt S. Vandenberg, 584 F. Supp. 2d 862 (E.D. Va. 2008) (Civil Action No. 2:08cv160), (the "Lien Suit").

Colonna's filed the Lien Suit on April 3, 2008. All of the amounts Colonna's claims due in this action resulted from work Colonna's completed prior to filing the Lien Suit. (Godfrey Dep., ECF No. 29-1, p. 20). During Colonna's performance it did not report directly to Key West, nor did anyone with Key West monitor Colonna's repair work. (Smith Dep., ECF No. 42-2, p. 7:5-14; Verge Dep., ECF No. 29-4, p. 56:18-57; 24). Although the Company performed custodial services after the Vessel was arrested, those services were requested and paid for by the

3

U.S. Marshals' office. (Godfrey Dep., ECF No. 29-1, pp. 34-35). Shortly after filing the Lien Suit, other claimants to the Vessel intervened. The first motion to intervene in the Lien Suit was filed by W3 Shipyards and Venture Dynamics Enterprises on April 16, 2008. (Civ. No. 2:08cv160, ECF No. 6). Colonna's requested that the Court sell the Vessel by a pleading filed June 11, 2008. (Civ. No. 2:08cv160, ECF No. 19)

On December 17, 2008, First State Bank acquired the Vessel in an auction conducted by the U.S. Marshals. (Civ. No. 2:08cv160, ECF Nos. 118, 134). The Court entered an agreed Order confirming the sale of the Vessel on February 5, 2009. (Civ. No. 2:08cv160, ECF No. 134).

The proceeds of sale were divided among Colonna's and other claimants in proportion to the amount of their claims. After payment of the custodial expenses, Colonna's received 83% of the available funds, a total of $677,365.46.[2] (Civ. No. 2:08cv160, ECF No. 139). Pursuant to the request of the purchaser, First State Bank, the Court entered an Order confirming title to the Vessel with Key West. (Civ. No. 2:08cv160, ECF No. 131).

During the period between the Vessel's arrest and its sale, Colonna's tried to resolve the outstanding bill with Key West officials, banks, and others involved in the project. (Godfrey Dep., ECF No. 29-1, pp. 25-45). Some of these discussions involved Commissioner Verge, who played a principal role in the City's efforts to complete the project. Verge made a number of statements suggesting the City intended to complete the project and wanted to see Colonna's paid for its work. These statements form the basis of Colonna's claimed oral contract with the City. (Id. at 25-29). Colonna's identifies a number of statements related to the City's post-arrest efforts to get Colonna's paid, the most explicit being:

---

[2] Colonna's also earned custodial expenses of $327,000.00. Including these expenses, $1,004,365.40 of the $1,350,000.00 paid for the Vessel went to Colonna's.

- Verge told Colonna's officials "it was his goal to get the shipyard paid and he was committed to getting the shipyard bill paid." (Id., p. 25).

- "Bill [Verge] was the principal who was telling Colonna's that it was his goal to get us paid. He wanted – to use his words – he was going to make us whole." (Id., p. 27).

- "They said they were going to get us paid." (Id., p. 37).

Verge denied that Key West ever promised to pay Colonna's, or that he was negotiating for Key West in the first instance. (Verge Dep., ECF No. 29-4, pp. 79-80). He characterized his role as a "mediator" trying to facilitate a settlement between Colonna's, the banks, and grantmakers to ensure completion of the project. (Id., p. 56).

After re-acquiring the Vessel, Key West eventually succeeded in completing the project and the Vandenberg reef is performing as expected. (Verge Dep., ECF No. 29-5, pp. 47-48).

## B.    SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 requires the Court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986). "A material fact is one 'that might affect the outcome of the suit under the governing law.' A disputed fact presents a genuine issue 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Spriggs v. Diamond Auto Glass, 242 F.3d 179, 183 (4th Cir. 2001) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

The party seeking summary judgment has the initial burden of informing the Court of the basis of its motion and identifying materials in the record it believes demonstrates the absence of a genuine dispute of material fact. Fed. R. Civ. P. 56(c); Celotex Corp., 477 U.S. at 322-25.

When the moving party has met its burden to show that the evidence is insufficient to support the nonmoving party's case, the burden shifts to the nonmoving party to present specific facts demonstrating that there is a genuine issue for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

In considering a motion for summary judgment, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000); see Anderson, 477 U.S. at 255. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

## C.    COLONNA'S CLAIMS

### 1.    Colonna's asserts both maritime and non-maritime claims.

The parties devote considerable briefing to the question of which law applies to Colonna's claims. The case was filed as a maritime case, with Colonna's also asserting supplemental jurisdiction over any non-maritime claims. (ECF No. 1, ¶¶ 1, 4). Key West initially moved to dismiss the case on the grounds that a Virginia court's maritime jurisdiction did not extend to a Florida municipality, because the City was not subject to service of process in the district. (ECF Nos. 7, 12). The Court rejected Key West's argument, holding that the Supreme Court precedent it relied upon did not limit the Court's maritime jurisdiction over the City in light of precedent from other circuits and the expansion of personal jurisdiction since that case was decided. Colonna's Shipyard, Inc. v. City of Key West, 735 F. Supp. 2d 414, 417–20 (E.D. Va. 2010).

Although the City embraced Colonna's claim of maritime jurisdiction in pressing its venue objection, Key West now argues that maritime law does not apply. It claims that Colonna's alleged oral contract lacks a sufficient nexus to maritime activities to bring the case within the Court's admiralty jurisdiction. As a result, it urges the Court to apply Florida law to determine both the existence and enforceability of any contract, as well as the elements of Colonna's claim to quantum meruit relief. Colonna's maintains its right to admiralty jurisdiction and remedies on both counts.

Neither party raised the Court's prior jurisdictional opinion in briefing their arguments, nevertheless, a brief review of the issue decided will illuminate the undersigned's recommendation. Key West's motion to dismiss relied on the 1890 Supreme Court case of In re Louisville Underwriters, 134 U.S. 488, 490 (1890). The City argued that In re Louisville limited the Court's exercise of admiralty jurisdiction to those parties subject to service of process within the district. Because the City was not subject to service within the district, it claimed maritime jurisdiction over it was lacking here, and sought either dismissal or transfer to Florida. (ECF No. 12, pp. 1-3).

In ruling on Key West's initial motion to dismiss, the Court was required to assume that all of the allegations in the Complaint were true. Beaman v. Pacific Mut. Life Ins. Co., 369 F.2d 653, 654 (4th Cir. 1966). Colonna's Complaint specifically alleged the existence of a maritime contract, and invoked maritime jurisdiction as the principal basis for filing the claim in federal court.[3] (ECF No. 1, ¶¶ 1, 4A, 30). Key West did not initially answer the claim, but challenged the Court's jurisdiction solely on the basis of the venue argument addressed in the Court's

---

[3] Importantly, diversity jurisdiction over the parties is also proper, as Colonna's is a Virginia corporation, and Key West, a Florida municipality, which concedes its contacts with Virginia are sufficient to confer personal jurisdiction. Colonna's v. City of Key West, 735 F. Supp. at 420.

opinion. Thus, with an undisputed claim of maritime jurisdiction, the Court did not address the nature of Colonna's claimed oral contract in detail. This was proper.

"Where jurisdictional facts, such as the existence of a maritime contract are 'intertwined with the facts central to the merits of the dispute . . . the entire factual dispute is appropriately resolved only by a proceeding on the merits' and it is inappropriate to dismiss the case for lack of subject matter jurisdiction." South Carolina State Port Authority v. Silver Anchor S.A., 25 F.3d 842, 847 (4th Cir. 1994) ("Silver Anchor II") (quoting Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982)). Indeed, the Fourth Circuit has explicitly held that where a plaintiff sues for breach of an oral maritime contract, and the defendant denies the existence of any such agreement, the District Court should assume that admiralty jurisdiction exists and proceed to determine the merits of the claim. Silver Anchor II, 25 F.3d at 847 (citations omitted).

In evaluating those merits now, however, the Court is not constrained by this jurisdictional presumption, nor bound to accept the plain allegations of the Complaint in deciding whether a contract exists, or whether any such contract is maritime. Indeed, after losing its motion to dismiss, Key West answered the Complaint, denying the existence of admiralty jurisdiction, and disputing both the existence of the alleged oral contract and its maritime character. (ECF No. 17). These issues, therefore, remain before the Court to resolve.

### a. Colonna's alleged oral contract claim lacks a maritime nexus.

The Court has already ruled that the Vandenberg was a "'vessel' within the Court's admiralty and maritime jurisdiction" and that Colonna's repairs to the Vessel resulted from a maritime contract. Colonna's v. U.S.A.F. General Hoyt S. Vandenberg, 584 F. Supp. 2d 862, 877 (E.D. Va. 2008). That contract, however, was with Reefmakers, not Key West. (Id. at 865). As Key West points out, Colonna's claims against it are sufficiently removed from the provision

of maritime services to warrant examining whether Colonna's claimed oral contract is a maritime claim.

To determine whether a contract falls under the Court's admiralty jurisdiction, the Court must "look to the subject matter of the . . . contract and determine whether the services performed under the contract are maritime in nature." Exxon Corp. v. Central Gulf Lines, Inc., 500 U.S. 603, 612 (1991) (citing Kossick v. United Fruit Co., 365 U.S. 731, 735-38 (1961). A contract to repair a ship is clearly maritime. Kossick, 365 U.S. at 735. Whereas, a contract to build a ship is non-maritime. New Bedford Dry Dock Co. v. Purdy, 258 U.S. 96, 99 (1922). A contract to sell a ship is also not a maritime contract. Flota Maritima Browning de Cuba, Sociadad Anonima v. Snobl, 363 F.2d 733, 735 (4th Cir. 1966). Where the contract sued upon involves only the agreement of a third party to pay the debt of another, that contract does not involve the performance of "maritime services," even if the underlying debt arose from a maritime contract. Pierside Terminal Operators, Inc. v. M/V Floridian, 423 F. Supp. 962, 968 (E.D. Va. 1976).

In the Floridian case, Judge Hoffman declined to extend maritime jurisdiction to a claim by a shipping agent that a vessel owner had agreed to be responsible for debts originally incurred by a charterer of the ship. In so ruling, the court noted that "a contract of indemnity", even where it be for default in the performance of a maritime service, is not essentially maritime in character since it cannot, by definition, "relate to a ship in its use as such." M/V Floridian, 423 F. Supp. at 969 (citing Black Sea State SS Line v. Association of Int. Tr. Dist., 95 F. Supp. 180 (S.D. N.Y. 1951). Such indemnity, the Court wrote "would have only quantitative reference to a maritime matter, not 'maritime flavor' which [is the] qualitative prerequisite to jurisdiction." Id.

In this case, the oral contract alleged by Colonna's is Key West's agreement to pay the past due debt of Reefmakers. (Godfrey Dep., ECF No. 29-1, pp. 20, 38). Colonna's does not dispute that all of the work for which it now seeks compensation was performed prior to the Lien Suit, and thus prior to any alleged oral agreement by Key West. (Id., p. 20). Although Colonna's performed additional maritime service after the sale of the Vessel, it was separately compensated for all of these services either by the Court through custodial expenses, (Civ. No. 2:08cv160, ECF No. 139), or by Key West directly, (Feb. 2009 Invoice, ECF No. 39-10). Moreover, Colonna's has not claimed that any of these additional maritime services were promised as consideration for the City's alleged oral agreement.

These facts bring the oral contract claim squarely within this Court's Floridian decision. The only oral agreement alleged by Colonna's involves payment for services which had already been performed. Thus, regardless of the nature of those services, the undertaking asserted against Key West has only a "quantitative reference" to a maritime subject, and no "maritime flavor" at all.

Colonna's has tried to distinguish Floridian, relying on the Fourth Circuit's decision in the Silver Anchor case. South Carolina State Ports. Auth. v. Silver Anchor S.A., 953 F.2d 639 (Table) (text available at 1992 WL 14591 (4th Cir. Jan. 31, 1992) (unpublished)).[4] (Silver Anchor I). In Silver Anchor I, the Fourth Circuit held that maritime jurisdiction existed over a ship owner's alleged oral promise to pay a past due debt incurred by a third party, which related to the provision of maritime services to a vessel. In so ruling, however, the Fourth Circuit explicitly observed that Floridian was correctly decided, and distinguished the case on the basis that, unlike the owner in Floridian, the ship owner before it had "agreed to take on the debt of the

---

[4] See Fed. R. App. P., Local R. 32.1; Hupman v. Cook, 640 F.2d 497, 501 n.7 (4th Cir. 1981).

third party in exchange, <u>inter alia</u>, for 'additional maritime services provided' to other vessels he owned." <u>Silver Anchor I</u>, 1992 WL 14591, at *2. The court wrote that, "unlike [the contract] in <u>Floridian</u>, maritime services are . . . centrally involved," and remanded the case, which had been dismissed on a jurisdictional motion, with directions to determine whether the alleged maritime services conferred any benefit on the ship owner. <u>Id.</u> In a later opinion, the court recounted in detail the additional maritime services provided, and the way in which these services benefited the ship owner asserted to be liable. <u>Silver Anchor II</u>, 23 F.3d at 846.

Colonna's cannot claim that Key West's alleged promise is infused with some maritime flavor by virtue of additional maritime services, as it has expressly – and repeatedly – stated that the "promises . . . were for payment of maritime work already performed on the Vessel." (ECF No. 39, p. 15). Any additional services the Company did perform related to custodial fees after arrest and berthing charges following the sale – neither of which the Company asserted as consideration for the alleged promise. The consideration Colonna's has asserted – purportedly delaying the sale of the arrested Vessel – also lacks any maritime character. <u>C.f.</u> <u>Flota Maritima</u>, 303 F.2d at 735 (noting rule that contracts for sale of a ship are not maritime contracts). Because Colonna's oral contract claim related exclusively to the City's alleged promise to pay a pre-existing debt, it is not a maritime contract and should be analyzed under the relevant state law.

### b. **Quantum Meruit claim arises out of Colonna's ship repairs.**

Although Colonna's contract claim is distinctly non-maritime, its <u>quantum meruit</u> claim is somewhat more broad. For <u>quantum meruit</u> to apply against Key West, the benefit allegedly conferred on the City would result from the repairs and modifications Colonna's performed on the Vessel. The Court has already ruled that these repairs gave rise to a maritime contract claim

against the Vessel. Colonna's Shipyard, Inc. v. U.S.A.F. Gen. Hoyt S. Vandenberg, 584 F. Supp. 2d at 877. The City has tried to link the oral contract and quantum meruit claims, but Colonna's reply brief correctly distinguishes the different theories alleged. (ECF No. 48, p. 5). Because all of the work asserted to benefit the City occurred prior to any alleged oral agreement, the quantum meruit claim necessarily arises out of a "maritime contract or other inherently maritime transaction," and admiralty jurisdiction is proper. Barna Conshipping, S.L. v. 2,000 Metric Tons of Abandoned Steel, No. 09-1817, (text available at 2011 U.S. App. LEXIS, 2751 at 18-19 (4th Cir. Feb. 10, 2011)) (unpublished). As a result, the Court will analyze Colonna's quantum meruit count as a maritime claim.

## 2. Colonna's Breach of Oral Contract Claim.

Colonna's breach of contract claim against Key West arises out of a series of conversations, negotiations, and representations by City officials following the arrest of the Vessel. The Company claims these representations formed an oral contract by which Key West agreed to pay Colonna's the balance due on its contract with Reefmakers. In its motion for summary judgment, Key West contends, among other things, that Colonna's has failed to establish the existence of an oral contract because the evidence is insufficient to establish either an offer or acceptance.

Having determined the alleged oral contract is not maritime, the Court must also address the parties' arguments as to which state law applies to the contract claim. While the parties agree that Virginia choice-of-law rules apply, Seabulk Offshore, Ltd. v. American Home Assur. Co., 377 F.3d 408, 418 (4th Cir. 2004), Key West asserts that, under the those rules, Florida law applies, and Colonna's claims the same rules dictate that Virginia law controls.

"[Q]uestions concerning the validity, effect, and interpretation of a contract are resolved according to the law of the state where the contract was made. Under Virginia law, a contract is made when the last act to complete it is performed . . . ." Id. at 419 (internal citations omitted). Not surprisingly, the parties disagree as to what act constituted the "last act" that completed the alleged oral contract between the parties. Key West asserts that the last act was the alleged promise made by Key West to pay Colonna's the balance due on its contract with Reefmakers. Key West contends that Florida law controls because that promise was allegedly made over the telephone by a Key West representative in the City of Key West, Florida. Colonna's, on the other hand, argues that its acceptance of Key West's promise—and its subsequent forbearance from selling the Vessel—was the last act that made the contract binding between the parties. According to Colonna's, that acceptance occurred over the telephone by its officers located in Norfolk, Virginia.

The choice of law analysis is complicated by the fact that the summary judgment record contains no evidence of a specific, definite promise, or any point of acceptance by representatives of Colonna's. See, e.g., Godfrey Dep., ECF No. 29-1, p. 29:3-6 ("Q: Was the verbal contract, was that something that was made by email or verbally over the telephone?" A: I would say it was verbal and it was in telephone conferences."); Id., p. 30:7-9 ("Q: Was there one specific telephone call that created the verbal contract or was it more than one? A: I believe it was more than one.") Id., p. 38:20-22 ("I think the timeframe from April, May, June of '08 would fairly be the timeframe of when that agreement was understood."). However, viewing the

evidence in the light most favorable to Colonna's, the Court will apply Virginia law to Colonna's breach of contract claim.[5]

"To claim a breach of contract, the Plaintiff must first establish that there was a valid contract to be breached." Sykes v. Brady-Bushey Ford, Inc., 69 Va. Cir. 219, (not reported in S.E. 2d, text available at 2005 WL 2787517, at *6 (Va. Cir. Ct. Oct. 27, 2005)). "A contract requires an offer, acceptance, and valuable consideration. For an oral contract to be valid and enforceable in Virginia, the terms of the contract must be 'reasonably certain, definite and complete to enable the parties and the courts to give the agreement exact meaning.'" Lamers v. Organizational Strategies, Inc., Civ. No. 1:08cv101 (text available at 2008 WL 779516, at *3 (E.D. Va. Mar. 24, 2008)) (unpublished) (quoting Richardson v. Richardson, 10 Va. App. 391, 396, 392 S.E. 2d 688, 690 (1990), overruled on other grounds, Flanary v. Milton, 263 Va. 20, 24, 556 S.E. 2d 767, 768 (2002)). "Whether the evidence establishes that a reasonably certain, definite and understandable contract was settled upon and entered into between the parties and thereafter breached by defendant is the ultimate question to be determined." Smith v. Farrell, 199 Va. 121, 127, 98 S.E. 2d 3, 7 (1957).

An essential element of a contract is an offer. "An offer is made where it is 'clear, definite, explicit and leave[s] nothing open for negotiation.'" Sykes, 2005 WL 2787517, at *6

---

[5]Because this Report and Recommendation concludes the elements of a valid oral contract are lacking, it ultimately makes little difference whether the Court applies Florida or Virginia law, as both jurisdictions require an offer, acceptance, and consideration. Compare infra p. 14 (discussing Virginia law) with St. Joe Corp. v. McIver, 875 So. 2d 375, 381 (Fla. 2004) ("An oral contract is subject to the basic requirements of contract law such as offer, acceptance, consideration and sufficient specification of essential terms.") (internal citations omitted); W.R. Townsend Contracting, Inc. v. Jensen Civil Const., Inc., 728 So. 2d 297, 300 (Fla. 1st DCA 1999) (to state a cause of action for breach of an oral contract, a complaint must allege facts that "demonstrate that the parties mutually assented to a 'certain and definite proposition' and left no essential terms open") (quoting Jacksonville Port Authority v. W.R. Johnson Enterprises, Inc., 624 So. 2d 313 (Fla. 1st DCA 1993)); Central Properties, Inc. v. William H. Robbinson, 450 So. 2d 277, 280 (Fla. 1st DCA 1984), modified, 468 So. 2d 986 (Fla. 1985) ("Where the parties are continuing to negotiate as to . . . essential terms, there can be no meeting of the minds.").

(quoting Chang v. First Colonial Sav. Bank, 242 Va. 388, 391-92 (1991)). Colonna's argues that Key West's offer can be inferred from the various representations made by its representatives, mainly Commissioner Verge. See, e.g., (ECF No. 1, p. 27) (alleging that during the time period of April through July of 2008, Key West "repeatedly" promised to pay to Colonna's the outstanding balance due on its contract with Reefmakers); (ECF No. 39, p. 19) (alleging that the parties "engaged in multiple conversations in which Verge represented to Colonna's that it would be paid for its work on the Vessel"). Key West argues that the "generalized statements" of its representatives relied upon by Colonna's do not "rise to the level of an enforceable promise to pay." (ECF No. 29, p. 11). The undersigned agrees with Key West.

When questioned about the factual basis for Colonna's breach of contract claim, Colonna's President and CEO, Thomas Godfrey, Jr., said this:

> Bill Verge told myself and Dave DiPersio that it was his goal to get the shipyard paid and he was committed to getting the shipyard bill paid, getting things cleared up and seeing that the project was finished. We talked regularly about all of his efforts to obtain funding and to try to work out the banking arrangements and so forth. Bill said it was his project. We were hopeful and trusting that it was a good solution for all of us to allow him to go and try to make those arrangements.

(ECF No. 29-1, p. 25:5-16). During his deposition, Godfrey was also questioned about Colonna's answers to Key West's interrogatories in which Colonna's refers to representations made by Verge on the specific dates of April 25, 2008, June 30, 2008, August 4, 2008, and November 3, 2008. Id., pp. 26:20-27:3; see (ECF No. 29-3, p. 85). Godfrey was unable to

provide any details about the alleged communications,[6] only that the alleged verbal agreement was formed — and an offer was made — at some time during the various telephone conversations between the parties while the Vessel was under arrest. (Godfrey Dep., ECF No. 29-1, pp. 28:8-33:25). For his part, Verge admitted that he made representations during conference calls in 2008 that he was attempting to secure funding for the project. (Verge Dep., Ex. 17, p. 78, ECF No. 29-6). However, when asked whether Key West promised to pay Colonna's if it would agree to not sell the Vessel, Verge was unequivocal:

> No, absolutely not. No conversations were ever held to that effect. . . . Well, as a businessman and an individual, it's nice to see that everybody gets paid, but there's no guarantees that that'll happen anytime when you get in any kind of situation. We never indicated to Colonna's that if they didn't get paid, we'd make it up to them somehow. That was never a discussion with anybody.

Id., pp. 79:18-80:4.

The only evidence of a definitive statement by Verge is a November 14, 2008 email he sent to Colonna's CFO Dave DiPersio – five months after the Company asked to have the Vessel sold. In that email, Verge states: "My top priority is always to be [sic] to get money in your hands as fast as possible" and "I will take charge of the situation and get this thing completed." (ECF No. 29-6 at Ex. 10).

Drawing all reasonable inferences in favor of Colonna's, the evidence is still insufficient to find that any offer was made. Put simply, there is no evidence in the record of a "clear,

---

[6]Godfrey responded:

> You know, it's a little convoluted to read this and I understand the question, but I – clearly I had a number of conversations with Bill [Verge]. Usually those conversations included the CFO, Dave DiPersio, and Bill [Verge] was the principal who was telling Colonna's that it was his goal to get us paid. He wanted – to use his words, he was going to make us whole and appreciated our cooperation. Things were very constructive between us and he kept us updated on his efforts over time.

(Godfrey Dep., ECF No. 29-1, p. 27:4-21).

definite, explicit" offer that "leave[s] nothing open for negotiation." Chang, 242 Va. at 391-92. Verge's statements are vague and almost always refer to payment from other unidentified sources. They amount to no more than gratuitous encouragement made during brainstorming sessions among the interested parties regarding how to obtain the funding necessary to complete the project. See, e.g., (ECF No. 29-4 at 61:22-25) ("Dave DiPersio is a nice guy, you know what I mean. Tried to work with him, you know. I told him everybody's working on trying to obtain additional funding from various sources.").

Godfrey's recollection of the statements is consistent with this characterization. Despite his claim that an oral agreement arose from these multiple conferences, he stated the parties never agreed when, or on what terms, payment would be made. (Godfrey Dep., ECF No. 29-1, pp. 33-34), and his statements regarding the alleged promise lack necessary detail, (id. pp. 27:16-17; 45:8-16) ("Bill . . . was telling Colonna's that it was his goal to get us paid."). Importantly, Godfrey could not define when the agreement was formed. (Id., p. 38: 20-22, describing the "timeframe from April, May and June of '08" as the "timeframe of when that agreement was understood"). This missing detail is fatal to Colonna's claim of an oral contract as it undermines the Company's argument that it gave consideration by delaying its eventual sale of the Vessel.

In fact, when Godfrey emailed Verge and others advising that the Company would have to move forward with selling the Vessel, he said his actions were necessary "given we have no offers of payment." (Id. p. 41:8). Asked to clarify what he meant by "no offers of payment" – in light of his earlier deposition testimony that the City's oral agreement to pay arose during the April – June timeframe, Godfrey was candid:

> I think my term here, or my choice of words, 'no offers of payment' may not best describe the situation, you know. Clearly Bill Verge had made representations to us that they were going to get the shipyard paid. What I'm referring to here is there is no specific payment that anyone can rely on, and that's where we were in

June of 2008. No one had come forward and said we're going to make this payment, X, Y, Z.

Id. pp. 41:18-25; 42:1-2) (emphasis added).

The record reveals, then, that at most the City made "representations" that they were going to get the shipyard paid, but not of a type "that anyone can rely on" – and short of the "clear, definite, explicit" offer necessary to create a binding oral contract. Sykes, 2005 WL 2787517, at *6 (statements by car dealer that customer would "be made whole" are too indefinite to create power of acceptance). Moreover, the Company's inability to say precisely when the offer was made and accepted eviscerates its claim that consideration rests in its decision to delay selling the Vessel. This is particularly so given that any alleged delay had ended in June, 2008 when Colonna's moved to enforce its lien rights.

Because the undersigned finds no agreement was formed it is not necessary to reach the City's various other defenses to the enforcement of an alleged oral contract.[7] The undersigned recommends that the Court grant the City's motion for summary judgment on the claimed oral contract.

## 3.    Colonna's claim of *Quantum Meruit*.

Unlike its alleged oral contract which relates exclusively to promises made after the Vessel's arrest, Colonna's quantum meruit claim involves benefits arising from its repairs to the Vessel. The Company claims that it conferred these benefits on the City, as Key West was "aware of the work being performed," and "recognized the value of the benefits it was receiving and knew Colonna's was entitled to compensation for its services." (ECF No. 42, pp. 12 – 13). The City denies that it received any benefit, and points out that it paid out more funds to

---

[7]  As a non-maritime contract, any alleged oral contract with Colonna's would also face significant statutory obstacles to enforcement. Va. Code § 11-2; Princeton Woods, LLC v. PNC Bank, 2009 WL 3614983 (E.D. Va. 2009) (statute of frauds); Richard L. Deal & Assoc., Inc. v. Commonwealth, 224 Va. 618, 623, 299 S.E. 2d 346, 348 (1983) (ultra vires contract is void ab initio).

complete the project than the City Commission originally authorized. Key West also argues that it had no role in selecting Colonna's or directing or monitoring its repair work. (ECF No. 47, pp. 4-5).

Although it is appropriate to analyze Colonna's quantum meruit claims under maritime law, where no federal law applies, the Court must look to relevant state law. Colonna's Shipyard, Inc., 735 F. Supp. 2d at 420 (citing Wilburn Boat Co. v. Firemen's Fund Ins. Co., 348 U.S. 310, 320-21, 75 S.Ct. 368, 99 L. E.D. 337 (1955)). "As long as state law would not 'impair the uniformity and simplicity of admiralty law' or 'defeat an otherwise meritorious maritime cause of action,'" it will control. Id. (citing Byrd v. Byrd, 657 F.2d 615, 617 (4th Cir. 1981)). Colonna's claims the benefit it conferred on Key West was its completion of repairs in Virginia. The Court will look, therefore, to Virginia's common law for the elements of Colonna's quantum meruit claim. Humphreys Ry. Inc. v. F/V Nils S, 603 F. Supp. 95, 98 (E.D. Va. 1984); M.P. Leasing Corp. v. Colonna's Shipyard, Civ. No. 2:07cv273 (text available at 2009 WL 2581575, at *4 (E.D. Va. May 8, 2009)) (unpublished) (applying Virginia's law of quantum meruit to maritime claim). In Virginia (as in most states), the equitable doctrine exists to avoid unjust enrichment. To establish a right to relief, "the claimant must show that he (i) rendered valuable services, (ii) to the defendant, (iii) which were requested and accepted by the defendant, (iv) under such circumstances as reasonably notified the defendant that the claimant, in performing the work, expected to be paid by the defendant. Raymond, Colesar, Glaspy & Huss, PC v. Allied Capital Corp., 961 F.2d 489, 491 (4th Cir. 1992) (citing Marine Development Corp. v. Rodak, 225 Va. 137, 300 S.E. 763 (1983)). On review of the record, Colonna's evidence of these elements is not sufficient to survive summary judgment.

**a. Key West did not request the repairs.**

Colonna's repair contract was with Reefmakers, and the Company does not dispute that it had no communications directly with Key West until the repairs were completed. (Godfrey Dep., ECF No. 29-1, p. 10, 21-22). All of the funds it claims due in this matter, were due from Reefmakers as a result of Reefmaker's breach of contract at the time the Lien Suit was commenced. (Id.; see also, ECF No. 1, ¶ 12).

While this written contract with Reefmakers is not an absolute bar to Colonna's quantum meruit claim, it does, "bear on whether the claimant [can] in fact establish[ ] the elements of quantum meruit – that is whether the defendant requested the services and whether the defendant was on notice that it would be expected to pay for them." Allied Capital, 961 F.2d at 491. In its motion, Key West has established that the repairs were performed pursuant to the Reefmakers contract. Colonna's has produced no evidence that Key West requested that it perform repairs, or monitored its performance. (Smith Dep., ECF No. 42-2, p. 7:8-12), ("To this day, I don't know that I've seen an invoice submitted by Colonna's"); (Sobocinski Dep., ECF No. 48-1, pp. 7:11 -8:20), (describing Colonna's engagement by Reefmakers). Thus, there is no evidence in the summary judgment record to suggest the City should have expected to pay for the services following Reefmakers' default. To the contrary, the record is replete with written contracts clarifying the City's limited financial role in the project while Colonna's performed the repairs. (MOU, ECF No. 29-6, pp. 30-44; ARK/Reefmakers Contract, ECF No. 48-3, pp. 9-13).

**b. No inequity results from Key West's completion of the project.**

The thrust of Colonna's quantum meruit claim appears to be that it would be inequitable to permit Key West to retain the benefit of its repairs in light of the outstanding debt due from Reefmakers and the integral role Colonna's repairs played in completing the project. The

Company argues at some length that the City's coffers will be enriched by the project and permitting the City to retain the benefit of the completed project would be inequitable in light of its outstanding claim. (ECF No. 42, pp. 14-16). Key West, for its part, argues that any benefit conferred accrued to Reefmakers as the party which agreed to pay for the repairs. The City also denies that it has benefited in any direct way from the project's completion. (ECF No. 29, p. 15).

Both these arguments miss a dispositive point. As to whether the City presently enjoys any benefit from the work Colonna's performed, facts may remain in dispute. These facts, however, are not material to Colonna's quantum meruit claim as there is nothing inequitable in the City retaining such benefits.

In addition to the complete lack of evidence that Key West requested, directed, or expected to pay for any pre-arrest repairs, Colonna's fully and successfully pursued its maritime lien remedy against the Vessel. All of the benefits it conferred on the project were encompassed in the Vandenburg herself, which sold at public auction to an arm's length purchaser. For reasons satisfactory to that purchaser, the Vessel was ultimately transferred back to Key West with the result that the project was successfully completed. There is no claim, however, that the price paid was less than the Vessel's fair market value, nor was there any challenge to the division of proceeds set forth in the Court's prior Order confirming the sale. The fact that those proceeds were insufficient to fully satisfy Colonna's bill does not impose upon the purchaser, or its transferee, any obligation to make up the difference. Were the law otherwise, no party would ever acquire a liened vessel for fear the disappointed lien claimants would accuse it of unjustly enjoying the benefits of any partially paid-for repairs.

This point is not diminished by Key West's unique ability to benefit from the repairs performed. Colonna's briefing targets this point, noting that Key West's acquisition of the

21

Vessel, and its successful sinking produced grant funding for the project, as well as economic and cultural benefits for the City. (Def. Mem. Supp. S.J., ECF No. 42, pp. 13-15). While facts may remain in dispute on this point, the dispositive fact is that Colonna's did not confer these benefits, rather they were derived from Key West's efforts with lenders, grant-makers and myriad other service providers involved in the project both before and after Colonna's completed the repairs. Colonna's work undoubtedly facilitated the City's efforts but it was all completed prior to the Lien Suit and any benefit Colonna's conferred on the project was valued and paid for when the Vessel sold.

Because there are no material facts in dispute on these two essential elements, the undersigned recommends the Court grant Key West's motion for summary judgment and dismiss the quantum meruit count.

**4.    Colonna's remaining claims based on Bailment and Constructive Fraud are not supported by the Summary Judgment Record.**

Colonna's also alleged that Key West was liable for damages based on theories that a bailment was created between the two parties, and that the City engaged in constructive fraud. The Company's brief opposing the defendant's motion for summary judgment fails to address the bailment claim at all, and concedes that discovery produced no evidence of constructive fraud. (ECF No. 39, p. 27). At oral argument, counsel acknowledged that the bailment claim was likewise unsupported by the evidence.

A bailment, broadly, involves the lawful, temporary and exclusive possession of property by someone who is not the owner. K-B Corp. v. Gallagher, 218 Va. 381, 383, 237 S.E. 2d 183, 185 (1977); see also S & W Air Vac Sys., Inc. v. Dep't of Revenue, 697 So. 2d 1313, 1315 (Fla. 5th Dist. Ct. App. 1997). To form a bailment, the lawful owner, the bailor, must deliver to the bailee, and the bailee must accept, possession of the property. K-B Corp., 237 S.E. 2d at 185.

When a vessel is placed at a shipyard for storage or repairs, a bailment results for the mutual benefit of the owner and the shipyard. <u>M.P. Leasing Corp. v. Colonna's Shipyard, Inc.</u>, Civ. No. 2:07cv273 (text available at 2009 WL 2581575, at \*4, (E.D. Va. May 8, 2009)) (unpublished), <u>McCutcheon v. Charleston Boat Works, Inc.</u>, Civ. No. 2:07cv4079, (text available at 2010 WL 2431017 at \*4, (D. S.C. June 14, 2010)) (unpublished). The bailment imposes on the shipyard a duty of reasonable or ordinary care to avoid loss or damage during the performance of its contractual duties. <u>McCutcheon</u>, 2010 WL 2431017, at \*4 (citing <u>In re Complaint of Lady Jane, Inc.</u>, 818 F. Supp. 1470, 1476 (M.D. Fla. 1992)). The claim most often arises when a vessel is damaged due to accidental casualty. <u>McCutcheon</u>, 2010 WL 2431017, at \*2. Even assuming Colonna's was a bailee, the Company has cited no authority, and the Court has found none, for the proposition that a bailment might impose a duty, independent of any underlying contract, for Key West to pay the cost of completed repairs unrelated to any party's negligence. Thus, the undersigned recommends that the Court grant defendant's motion for summary judgment on the claim of liability for breach of bailment.

With regard to constructive fraud, Colonna's Complaint alleged that the defendant "knowingly made a material false representation" that it would have sufficient funding to satisfy alleged debts owed to the plaintiff. (ECF No. 1, p. 6). The Company acknowledged in its response brief that there is insufficient evidence to support a constructive fraud claim, (ECF No. 39, p. 27), and plaintiffs' counsel reiterated this concession at oral argument.

In order to show constructive fraud in Florida or Virginia, a plaintiff must demonstrate that the defendant, either negligently or innocently, made a false representation of material fact, that the plaintiff relied on the false representation, and that this reliance led to damages. <u>Supervalu, Inc. v. Johnson</u>, 276 Va. 356, 367, 666 S.E. 2d 335, 341-42 (2008); <u>see also</u> <u>Taylor v.</u>

Kenco Chemical & Manufacturing Corp., 465 So. 2d 581 (Fla. 1st DCA 2008) (finding that constructive fraud exists "where a duty under a confidential or a fiduciary relationship has been abused."). Fraud cannot ordinarily be "predicated on unfulfilled promises or statements regarding future events," and "[u]nder no circumstances . . . will a promise of future action support a claim of constructive fraud." Supervalu, 666 S.E. 2d at 342.

Because the plaintiff has failed to produce any evidence of misrepresentation – future or otherwise (ECF No. 39, p. 27) – the undersigned recommends that the Court grant defendant's motion for summary judgment on the claim of constructive fraud.[8]

## D.   RECOMMENDATION

For the foregoing reasons the undersigned recommends that the Court grant Key West's motion for summary judgment, deny Colonna's motion for summary, and dismiss Colonna's claims against the City

## E.   REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.   Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this Report to the objecting party, 28 U.S.C. § 636(b)(1)(C), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

---

[8]   If adopted, the recommended disposition will make it unnecessary to address Colonna's claim for a constructive trust. Although a request for a constructive trust is often linked with an allegation of constructive fraud, or with a particular fiduciary duty, Virginia law does not require such a link, so long as equity demands that the trust be created. Jones v. Harrison, 250 Va. 64, 458 S.E. 2d 766, 769 (1995). In this case, however, the equitable claims Colonna's raised in its complaint – including the claim of constructive fraud – are not supported by the summary judgment record. See Colonna's Shipyard, Inc., 735 F. Supp. 2d at 420-21. Absent cause for equity to impose a trust, none arises.

2. A district judge shall make a <u>de novo</u> determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of the right to appeal from a judgment of this Court based on such findings and recommendations. <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Carr v. Hutto</u>, 737 F.2d 433 (4th Cir. 1984); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984).

/s/

Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia

May 12, 2011

## Clerk's Mailing Certificate

A copy of the foregoing Report and Recommendation was mailed this date to each of the following:

John D. Padgett
McGuire Woods, LLP
101 W. Main Street, Suite 9000
Norfolk, VA 23510-1655

Robert W. McFarland
McGuire Woods, LLP
101 W. Main Street, Suite 9000
Norfolk, VA 23510-1655

Charles Barnet Lustig
Shuttleworth, Ruloff, Swain, Haddad & Morecock, PC
4525 South Blvd., Suite 300
Virginia Beach, VA 23452

Thomas B. Shuttleworth, II
Shuttleworth, Ruloff, Swain, Haddad & Morecock, PC
4525 South Blvd., Suite 300
Virginia Beach, VA 23452

Theodore L. Shinkle
Gray Robinson PA
1795 West Nasa Blvd.
P. O. Box 1870
Melbourne, FL 32902-1870

Fernando Galindo, Clerk

By     L. Howard
Deputy Clerk

May 13 _____,2011